**BARON & BUDD P.C.**
Scott Summy (pending Pro Hac Vice)
(Texas Bar No. 19507500)
Carla Burke (pending Pro Hac Vice)
(Texas Bar NO. 24012490)
Celeste Evangelisti (SBN 225232)
John P. Fiske (SBN 249256)
Jason J. Julius (SBN 249036)
11440 West Bernardo Court Suite 265
San Diego, CA 92127
Telephone:  858-225-7200

**OFFICE OF THE CITY ATTORNEY**
Glen Googins, City Attorney
California State Bar No. 137977
Bart Miesfeld, Senior Assistant City Attorney
California State Bar No. 126056
276 4th Ave
Chula Vista, CA 91910-2631
Telephone: 619-691-5037

*Attorneys for Plaintiff City of Chula Vista*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF CHULA VISTA, a municipal corporation;  ) ) ) | Case No.  **'18 CV 1942 BEN JMA** |
| Plaintiff,  ) ) | |
| v.  ) ) | **COMPLAINT** |
| MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION,  ) ) ) ) | |
| Defendants.  ) | |

Plaintiff the CITY OF CHULA VISTA ("the City") hereby alleges, upon information and belief, as follows:

## I.   INTRODUCTION

1.   Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants – found in bays, oceans, rivers, streams, soil, and air. PCBs are persistent in the environment, easily transfer up the food chain, or bioaccumulate, and concentrations in tissues biomagnify as this process occurs.  As a result, PCBs have been detected in the tissues of all living beings on earth including all forms of marine life, various animals and birds, plants and trees, and humans. The extent of PCB contamination is troubling because PCBs cause a variety of adverse human health effects. In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects. In addition, PCBs can impair and even destroy populations of fish, birds, and other animals.

2.   Monsanto Company has repeatedly held itself out as the sole manufacturer of PCBs in the United States between 1935 to 1979, and trademarked the name "Aroclor" for certain PCB compounds.  Although Monsanto knew for decades that PCBs were toxic, knew that they could not be contained and as a result were widely contaminating all natural resources and living organisms, and knew that there was no safe way to dispose of PCBs, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.

3.   U.S. EPA (2000b) has classified PCBs as 'probable human carcinogens.' Studies have suggested that PCBs may play a role in inducing breast cancer. Studies have also linked PCBs to increased risk for several other cancers

including liver, biliary tract, gall bladder, gastrointestinal tract, pancreas, melanoma, and non-Hodgkin's lymphoma. PCBs may also cause non-carcinogenic effects, including reproductive effects and developmental effects (primarily to the nervous system). PCBs tend to accumulate in the human body in the liver, adipose tissue (fat), skin, and breast milk. PCBs have also been found in human plasma, follicular fluid, and sperm fluid. Fetuses may be exposed to PCBs in utero, and babies may be exposed to PCBs during breastfeeding. According to U.S. EPA (2000b), some human studies have also suggested that PCB exposure may cause adverse effects in children and developing fetuses while other studies have not shown effects. Reported effects include lower IQ scores, low birth weight, and lower behavior assessment scores.

4. PCBs have traveled into the City of Chula Vista's stormwater system and San Diego Bay in a variety of ways. PCBs were used in many industrial and commercial applications such as paint, caulking, transformers, capacitors, coolants, hydraulic fluids, plasticizers, sealants, inks, lubricants, and other uses. PCBs regularly leach, leak, off-gas, and escape their intended applications, causing runoff during naturally occurring storm and rain events, after being released into the environment. The runoff originates from multiple sources and industries and enters the City of Chula Vista's stormwater system and San Diego Bay through stormwater and dry weather runoff.

5. The natural fate and transport of PCBs result in the gathering and collection in stormwater through no fault of the City of Chula Vista, which lawfully discharges water into San Diego Bay through its Municipal Separate Storm Sewer System (MS4) NPDES permit.

6. Monsanto's PCBs have been found in and around San Diego Bay ("the Bay") at levels that require cleanup in certain areas. At different times and locations, PCBs have been detected in the Bay's water, sediments, fish, and lobsters. PCBs entered the Bay in a variety of ways. PCBs regularly leach, leak,

off-gas, and escape their intended applications into air, soil, and water.  PCBs also leach from landfills and other disposal locations and can enter the Bay with stormwater and dry weather runoff.

7.   U.S. EPA classifies San Diego Bay as "Impaired" due to the presence of PCBs.

8.   As a public property owner and former trustee of the Bay, Plaintiff seeks to recover damages for retrofit injuries to stormwater system property and/or other public property including trust lands to the extent the City is trustee of such public lands.

## II.   PARTIES

### A. Plaintiff

9.   Plaintiff City of Chula Vista ("Plaintiff" or "City") is a California Charter City and municipal corporation, duly organized and existing by virtue of the laws of the State of California.  The City was the trustee of certain relevant tidelands and submerged lands in and around the Bay from the early 1900s through 1963, when that property was transferred to the Port District.

10.   Plaintiff brings this suit pursuant to California Code of Civil Procedure 731, and California Civil Code sections 3479, 3480, 3491, 3493, and 3494 and any other applicable codes or sources of relief available for monetary damages caused by Monsanto's PCBs.

### B. Defendants

11.   Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri.

12.   Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

13.   Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack, New Jersey.  Pharmacia is

now a wholly-owned subsidiary of Pfizer, Inc.

14.     The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business.  Old Monsanto began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late 1970s.

15.     Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations.  The corporation now known as Monsanto operates Old Monsanto's agricultural products business.  Old Monsanto's chemical products business is now operated by Solutia.  Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

16.     Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business.  Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.[1]

17.     Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business – including the manufacture and sale of PCBs.[2]

18.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.  Solutia's reorganization was completed in 2008.  In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and Monsanto entered into several agreements under which Monsanto continues to

---

[1] *See* MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October 8, 2013); *see also* Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx (last accessed April 26, 2018).
[2] *See id.*

manage and assumed financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.[3]

19.    Monsanto represented in its most recent Form 10-K (for the fiscal year ending August 31, 2016):  "Monsanto is involved in environmental remediation and legal proceedings to which Monsanto is party in its own name and proceedings to which its former parent, Pharmacia LLC ("Pharmacia") or its former subsidiary, Solutia, Inc. ("Solutia") is a party but that Monsanto manages and for which Monsanto is responsible pursuant to certain indemnification agreements. In addition, Monsanto has liabilities established for various product claims. With respect to certain of these proceedings, Monsanto has established a reserve for the estimated liabilities."  The document specifies that the company holds $545 million in that reserve.[4]

20.    Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants" or "Monsanto."

## III.    JURISDICTION AND VENUE

21.    This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between Plaintiff and Defendants.  Plaintiff is located in California, but no Defendant is a citizen of California.  Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

22.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. §

---

[3] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed April 26, 2018).

[4] See Monsanto Company, Form 10-K (for the fiscal year ended Aug. 31, 2016), available at http://www.monsanto.com/investors/pages/sec-filings.aspx?page=0&group=1&limit=1 (last accessed April 26, 2018).

1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## IV.   PLAINTIFF'S STANDING

### I.   Stormwater System Damage and Retrofit

23.    The City has property rights in its stormwater system, captured stormwater, and tidelands or submerged lands, and other public trust lands that are contaminated with Monsanto's PCBs, to the extent the City of Chula Vista owns or holds lands in public trust.

24.    The City owns, manages, and operates a municipal stormwater and dry weather runoff system, which captures, collects, reuses for beneficial purposes, and/or transports stormwater and dry weather runoff.

25.    Monsanto's PCBs have contaminated and damaged multiple facilities within the City's stormwater and dry weather runoff systems.

26.    As a result of Monsanto's PCB's presence, the City cannot operate many of its stormwater and dry weather runoff systems as designed because the system now requires upgrades and retrofits to accommodate Monsanto's PCBs.

27.    The City has incurred and will continue to incur costs to reduce PCBs from stormwater and dry weather runoff, which includes efforts to capture and beneficially use stormwater and dry weather runoff to augment existing water supplies.

28.    The City's stormwater and dry weather runoff management system is damaged such that multiple facilities within the City's system have been and must be further retrofitted and improved in order to reduce and remove PCBs from stormwater and dry weather runoff.  The retrofits and improvements required to reduce PCBs from stormwater and dry weather runoff have cost and will continue to cost the City money.

29.    The City's stormwater system includes and will include into the future inlets, outfalls, pipes, drains, catch basins, bioswales, gutters, city streets, and other

infrastructure and systems.   The City owns and operates the entire system, significant parts of which have been damaged and must be retrofitted to accommodate for the presence of Monsanto's PCBs.

30.     The retrofits include but are not limited to new infrastructure build, infrastructure renovation, additional street sweeping, system cleaning additional filtering, new engineering and design, new source control program development and management, and other additional retrofits to the current system.

31.     Retrofits to impacted facilities within the City's stormwater system are required to reduce and remove Monsanto's PCBs to prevent further contamination of the San Diego Bay.

32.     Retrofits to the City stormwater system are in compliance with the City's BMP Design Manual[5], discussed further in the following sections.

33.     The City's retrofits also include new development designed to remove or reduce Monsanto's PCBs from City stormwater and dry weather runoff while capturing stormwater and dry weather runoff for beneficial uses to augment existing water supplies.

## II. AB 2594 STORMWATER RESOURCES: USE OF CAPTURED WATER.

34.     The Legislature codified the City's property interest in stormwater as a usufructuary right.   On August 25, 2016, the California State Legislature unanimously passed legislation confirming and codifying the Cities' use rights in stormwater.   Assembly Bill 2594 passed in the Senate on August 22, 2016 by a vote of 38-0.[6]   AB 2594 passed in the Assembly on August 25, 2016 by a vote of 78-0.[7]   Not one California Senator or Assemblymember voted against AB 2594.

---

[5] City of Chula Vista, BMP Design Manual, December 2015 / First Update May 2017, https://www.chulavistaca.gov/home/showdocument?id=11881 (last accessed August 21, 2018).
[6] https://leginfo.legislature.ca.gov/faces/billVotesClient.xhtml?bill_id=201520160AB2594 (last accessed April 26, 2018)
[7] *Id.*

35.     The unanimously passed bill was signed into law by Governor Brown on September 23, 2016.[8]  The Bill adds a new section 10561.7 to the Water Code to provide that:

> (a) A public entity that captures stormwater from urban areas, in accordance with a stormwater resource plan, before the water reaches a natural channel shall be entitled to use the captured water to the extent that the water augments existing water supplies.

36.     The Bill's legislative history explains, "This bill will make clear that public entities can capture urban stormwater… and use it.  This will encourage more stormwater capture and will provide additional options to finance stormwater systems."[9]  This right to use has long been recognized as a property right under California law.  *See, e.g.*, *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 457 F.Supp.2d 455, 460 (2006), and discussion, *infra*.

### III.   WATER CODE SECTION 10560, ET SEQ. "THE STORMWATER RESOURCE PLANNING ACT"

37.     The Water Code confers on cities a right to use stormwater.  Due to ever-increasing population demands, historically significant drought conditions,[10] climate change,[11] and the scarcity of water as a resource in California, stormwater has been recognized as an important resource for California cities.

---

[8] https://www.gov.ca.gov/news.php?id=19559 (last accessed April 26, 2018)

[9] 08/23/16- Assembly Floor Analysis, CONCURRENCE IN SENATE AMENDMENTS, Analysis Prepared by: Ryan Ojakian, Dated 08/23/16; https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201520160AB2594 (last accessed April 26, 2018)

[10] Stormwater and Green Infrastructure:  The Next Generation of Los Angeles Stormwater Infrastructure, Alf W. Brandt, Office of State Assemblymember Anthony Rendon, Sacramento, California, American Bar Association, Section of Environment, Energy, and Resources, 23rd Section Fall Meeting, Chicago, Illinois, October 28-31, 2015.

[11] California Water Code section 10560, et seq., "The Stormwater Resource Planning Act,"  "(d) Historical patterns of precipitation are predicted to change and

In the last decade, as prolonged periods of drought restricted water supplies, California's attention to stormwater has shifted to how stormwater could become a water resource *opportunity*.  Cities faced substantial costs for stormwater treatment plants.  They started developing plans for 'stormwater capture' projects to take advantage of the potential for water supply....[12]

38.    Prior to AB 2594, the California State Legislature developed, passed, and amended The Stormwater Resource Planning Act, addressing stormwater as a resource and conferring use or usufructuary rights on the City.[13]   The Act authorizes the City to develop a stormwater resource plan, including compliance with stormwater regulations and beneficial capture of stormwater.[14]   The Legislature's findings include the following:[15]

(b) Improved management of stormwater and dry weather runoff, including capture, treatment, and reuse by using the natural function of soils and plants, can improve water quality, reduce localized flooding, and increase water supplies for beneficial uses and the environment.

(e) When properly designed and managed, the capture and use of stormwater and dry weather runoff can contribute significantly to local water supplies through onsite storage and use, or letting it infiltrate into the ground to recharge groundwater, either onsite or at regional facilities, thereby increasing supplies of drinking water.

---

an increasing amount of California's water is predicted to fall not as snow in the mountains, but as rain in other areas of the state.  This will likely have a profound and transforming effect on California's hydrologic cycle and much of that water will no longer by captured by California's reservoirs, many of which are located to capture snow melt."

[12] Stormwater and Green Infrastructure:  The Next Generation of Los Angeles Stormwater Infrastructure, Alf W. Brandt, Office of State Assemblymember Anthony Rendon, Sacramento, California, American Bar Association, Section of Environment, Energy, and Resources, 23rd Section Fall Meeting, Chicago, Illinois, October 28-31, 2015.

[13] California Water Code section 10560, et seq., "The Stormwater Resource Planning Act"

[14] California Senate Bill (Pavley), Chap. 620 of 2009 Statutes.

[15] Water Code section 10561.

(g) Stormwater and dry weather runoff can be managed to achieve environmental and societal benefits such as wetland creation and restoration, riverside habitats, instream flows, and an increase in park and recreation lands, and urban green space.

(h) Stormwater and dry weather runoff management through multiobjective projects can achieve additional benefits, including augmenting recreation opportunities for communities, increased tree canopy, reduced urban heat island effect, and improved air quality.

(j) The capture and use of stormwater and dry weather runoff is not only one of the most cost-effective sources of new water supplies, it is a supply that can often be provided using significantly less energy than other sources of new water supplies.

39.     Section 10562 confers usufructuary rights upon the City regarding two sources of water—dry weather runoff and stormwater, defined as follows:[16]

(a) 'Dry weather runoff' means surface waterflow and waterflow in storm drains, flood control channels, or other means of runoff conveyance produced by nonstormwater resulting from irrigation, residential, commercial, and industrial activities.

(b) 'Stormwater' means temporary surface water runoff and drainage generated by immediately preceding storms.

40.     The City's plans for beneficial uses of stormwater and dry weather runoff meet the requirements of Water Code section 10562(b), including the following:

(1) Be developed on a watershed basis.

(2) Identify and prioritize stormwater and dry weather runoff capture projects for implementation in a quantitative manner, using a metrics-based and integrated evaluation and analysis of multiple benefits to maximize water supply, water quality, flood management, environmental, and other community benefits within the watershed.

---

[16] CA Water Code section 10561.5.

(3) Provide for multiple benefit project design to maximize water supply, water quality, and environmental and other community benefits.

(4) Provide for community participation in plan development and implementation.

(5) Be consistent with, and assist in, compliance with total maximum daily load (TMDL) implementation plans and applicable national pollutant discharge elimination system (NPDES) permits.

(6) Be consistent with all applicable waste discharge permits.

(7) Upon development, be submitted to any applicable integrated regional water management group. Upon receipt, the integrated regional water management group shall incorporate the stormwater resource plan into its integrated regional water management plan.

(8) Prioritize the use of lands or easements in public ownership for stormwater and dry weather runoff projects.

41.    The California Legislature does not require that cities specifically call the plan, the development of the plan, or the component parts of the plan a "Stormwater Resource Plan," recognizing that cities engage in stormwater resource management in a multitude of ways.[17]   Moreover, the Legislature does not require that the plan be constituted in any one singular plan at any one time, but rather the Legislature acknowledges that cities will be *developing* and constantly improving their plans, which components parts may be found in multiple other plans.[18]   The plan may be a proposed plan.[19]

42.    Water Code section 10562(c) states,

---

[17] Water Code section 10562(c).
[18] Water Code section 10562(c).
[19] *Id.*

The proposed or adopted plan shall meet the standards outlined in this section. The plan need not be referred to as a "stormwater resource plan." Existing planning documents may be utilized as a functionally equivalent plan, including but not limited to, watershed managements plans, integrated resource plans, urban water management plans, or similar plans. If a planning document does not meet the standards of this section, a collection of local and regional plans may constitute a functional equivalent, if the plans collectively meet all of the requirements of this part.

43. The City's plans for beneficial uses of stormwater meet the requirements of Water Code section 10562(d), which states, "An entity developing a stormwater resource plan shall identify in the plan all of the following:

(1) Opportunities to augment local water supply through groundwater recharge or storage for beneficial use of stormwater and dry weather runoff.

(2) Opportunities for source control for both pollution and stormwater and dry weather runoff volume, onsite and local infiltration, and use of stormwater and dry weather runoff.

(3) Projects to reestablish natural water drainage treatment and infiltration systems, or mimic natural system functions to the maximum extent feasible.

(4) Opportunities to develop, restore, or enhance habitat and open space through stormwater and dry weather runoff management, including wetlands, riverside habitats, parkways, and parks.

(5) Opportunities to use existing publicly owned lands and easements, including, but not limited to, parks, public open space, community gardens, farm and agricultural preserves, schoolsites, and government office buildings and complexes, to capture, clean, store, and use stormwater and dry weather runoff rather onsite or offsite.

(6) Design criteria and best management practices to prevent stormwater and dry weather runoff pollution and increase effective stormwater and dry weather runoff management for new and upgraded infrastructure and residential, commercial, industrial, and public development. These design criteria and best management practices

shall accomplish all of the following:

(A) Reduce effective impermeability within a watershed by creating permeable surfaces and directing stormwater and dry weather runoff to permeable surfaces, retention basins, cisterns, and other storage for beneficial use.

(B) Increase water storage for beneficial use through a variety of onsite storage techniques.

(C) Increase groundwater supplies through infiltration, where appropriate and feasible.

(D) Support low-impact development for new and upgraded infrastructure and development using low-impact techniques.

(7) Activities that generate or contribute to the pollution of stormwater or dry weather runoff, or that impair the effective beneficial use of stormwater or dry weather runoff.

(8) Projects and programs to ensure the effective implementation of the stormwater resource plan pursuant to this part and achieve multiple benefits.  These projects and programs shall include the development of appropriate decision support tools and the data necessary to use the decision support tools.

(9) Ordinances or other mechanisms necessary to ensure the effective implementation of the stormwater resource plan pursuant to this part.

## IV.   CALIFORNIA WATER RIGHTS LAW

### A. The State Does Not "Own" the Water in the Traditional Meaning

44.   The State of California does not "own" water in the traditional meaning of the word.  *State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1030. "In California, the groundwater is not owned by any individual or governmental entity but rather by 'the people of the State' for which the 'State as an entity is the holder of the legal title as trustee for the benefit of the people of the

state.'" *In re Methy Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 457 F.Supp.2d 455, 460 (2006) (footnote omitted).[20]

### B. Beneficial Use Rights v. "Ownership"

45.    The City has *relative beneficial use rights* rather than outright "ownership" in the traditional sense of the word. *State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1024. ("[M]odern water law focuses on the concept of water *rights* rather than water *ownership*.") (quoting 1 Waters and Water Rights (1991 ed.) § 4.01, p. 65.).

46.    When the City captures stormwater and dry weather runoff, it "salvages" or "rescues" the water, and as a rescuer has a prior right to it. *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 304.  The City's rescued or developed waters "are essentially new waters," and the right to use and distribute them belongs to the rescuers. *Pomona Land & Water Co. v. San Antonio Water Co.* (1908) 152 Cal. 618, 623.

### V. USUFRUCTUARY RIGHTS/INTERESTS CREATE A PROPERTY INTEREST

47.    The City has a usufructuary right and property interest in stormwater and dry weather runoff by its beneficial capture and use of stormwater.  *Fullerton v. State Water Resources Control Board*, 90 Cal.App.3d 590, 597 (1979).

---

[20] The People of the State make water policy and control water usage. *State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1030. "But the State's power under the Water Code is the power to control and regulate use; such a power is distinct from the concept of 'ownership' as used in the Civil Code and in common usage." *Id.* "'Ownership of California's water is vested generally in the state's residents, but individuals and entities can acquire 'water rights,' the right to divert water from its natural course for public or private use.'" *Siskiyou County Farm Bureau v. Department of Fish and Wildlife*, 237 Cal.App.4th 411, 423 (2015).  The City of Chula Vista's interest is correctly viewed as a relative use right fulfilling State Constitutional policy, Water Code section 10560, et seq., and AB 2594 regarding beneficial uses of water.

48.   The City built, owns, and manages an entire stormwater system, including plans and programs designed and intended to capture stormwater for beneficial uses outlined in The Stormwater Resources Planning Act, discussed further below.

49.   The City's beneficial capture and use is in line with *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 457 F.Supp.2d 455, 460 (2006), wherein the court explains that usufructuary interests are property interests in California. "[A] usufructuary interest may be acquired and this interest will be deemed to be a 'possessory property right.' [footnote omitted]."

## VI.   PROPERTY INTERESTS ESTABLISH LEGAL STANDING

50.   The City has a usufructuary right and need not "own" the stormwater and dry weather runoff in order to have standing to bring this suit. The City's usufructuary interest establishes legal standing.[21]

/ / /

/ / /

_____

[21] *Orange County Water Dist. v. Arnold Engineering Co.*, 196 Cal.App.4th 1110, 1125-1126, footnote 5 of *Orange County Water Dist.* reads, "'[T]he right of property in water is usufructary, and consists not so much of the fluid itself as the advantage of its use.' [Citation.]  Hence, the cases do not speak of the ownership of water, but only of the right to its use. (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 441, 189 Cal.Rptr. 346, 658 P.2d 709.)" *Id.* at 1127; in *Selma Pressure Treating Company, Inc. v. Osmose Wood Preserving Company of American, Inc., et al.*, 221 Cal.App.3d 1601 (1990), the court explains a usufructuary interest establishes a property interest, and thus legal standing, for public entities in public nuisance cases; in *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 676 F.Supp.2d 139, 146, fn. 40 (S.D.N.Y. 2009), the court explains "[b]ecause OCWD has a 'possessory property right, that it alleges has been damaged by defendants' conduct, neither its negligence nor products liability claims are barred for lack of a cognizable interest." *Id.* at 461. "OCWD has established a valid usufructuary interest which is independent of the State or the People's general interest in groundwater. [footnote omitted] Accordingly, OCWD may seek damages on its public nuisance claim to the extent that the alleged nuisance has interfered with that right." *Id.* at 466.

## VII. THE CITY'S CAPTURE AND BENEFICIAL USE OF STORMWATER

51.     The City manages storm water as a resource, and the City's beneficial uses of stormwater align with The Stormwater Resources Planning Act.  The City has multiple stormwater and integrated water management plans that together meet the eight requirements of a stormwater resource plan under Water Code Section 10562(b), listed below:[22]

A stormwater resource plan shall:

(1) Be developed on a watershed basis.

(2) Identify and prioritize stormwater and dry weather runoff capture projects for implementation in a quantitative manner, using a metrics-based and integrated evaluation and analysis of multiple benefits to maximize water supply, water quality, flood management, environmental, and other community benefits within the watershed.

(3) Provide for multiple benefit project design to maximize water supply, water quality, and environmental and other community benefits.

(4) Provide for community participation in plan development and implementation.

(5) Be consistent with, and assist in, compliance with total maximum daily load (TMDL) implementation plans and applicable national pollutant discharge elimination system (NPDES) permits.

(6) Be consistent with all applicable waste discharge permits.

(7) Upon development, be submitted to any applicable integrated regional water management group.  Upon receipt, the integrated regional water management group shall incorporate the stormwater resource plan into its integrated regional water management plan.

(8) Prioritize the use of lands or easements in public ownership for stormwater and dry weather runoff projects.

Water Code Section 10562(b).

_____

[22] Water Code Section 10562(c) explains that a plan need not be titled a "stormwater resource plan," and that a collection of local and regional plans may constitute a functional equivalent of a stormwater resource plan.

52.     First, the City is developing its beneficial uses on a watershed basis.[23] The City lies entirely within the San Diego Bay Watershed and is a Responsible Party in the San Diego Bay Watershed Management Area and, as such, uses the San Diego Bay Watershed Management Area Water Quality Improvement Plan ("WQIP")[24] as a framework for managing water quality and storm water. In addition, the City has developed its Jurisdictional Runoff Management Program ("JRMP")[25] to establish local implementation programs intended to fulfill the WQIP strategies and goals.

53.     Second, the City is identifying and prioritizing stormwater and dry weather runoff capture projects for implementation in a quantitative manner.[26]

54.     Third, the City provides for multiple-benefit project design to maximize water supply, water quality, and environmental and other community benefits.[27]   The City's Jurisdictional Runoff Management Program and BMP Design Manual provide for project and BMP designs that will prevent pollutants from reaching water bodies and thus increasing water quality.  The plans maximize water supply through water conservation and infiltration.  And the BMP Design Manual explains that "the conservation and restoration of natural areas must be considered in the site [BMP] design process."[28]

---

[23] Water Code section 10562(b)(1).

[24] The San Diego Bay Water Quality Improvement Plan can be downloaded at http://www.projectcleanwater.org/download/san-diego-bay-sdb-water-quality-improvement-plan-wqip/ (last accessed August 21, 2018).

[25] City of Chula Vista, Jurisdictional Runoff Management Program, last updated January 2018, https://www.chulavistaca.gov/home/showdocument?id=10060 (last visited August 21, 2018).

[26] Water Code section 10562(b)(2).

[27] Water Code section 10562(b)(3).

[28] BMP Design Manual, *supra* fn. 5, at page 4-6.

55.    Fourth, the City also provides for community participation in plan development and implementation.[29]  For example, the City's Jurisdictional Runoff Management Program ("JRMP") emphasizes the community's role in implementing Chula Vista's water management plan:[30]

> Public participation also plays an important role in achieving the goals of the JRMP. Involving the general public and schoolchildren in the stormwater program helps improve stormwater awareness among individuals, and may lead to improved water quality. Collaboration between the City and the community may also help foster a sense of shared responsibility in protecting water quality both locally and regionally.

The JRMP also explains how the community participates in the development of water management plans:

> The WQIP is the instrument that identifies priority water quality conditions in the watershed; establishes water quality improvement goals, strategies and schedules; and develops water quality improvement monitoring and assessment programs. In order to seek public participation and input, various stakeholders and the general public were invited to participate in the process by volunteering to become members of a Consultation Panel for the San Diego Bay WMA. Public workshops and Consultation Panel meetings were organized to provide opportunities for public participation as drafts of various program elements and sections of the WQIP were being developed. Draft documents were revised to incorporate comments received on each topic. In addition to the WQIP, which has been developed at the watershed level, the City of Chula Vista has updated its Storm Water Ordinance, this JRMP document and the Chula Vista Development Storm Water Manual (Fall 2015) (BMP Design Manual). Drafts of these documents were placed on the City's website

---

[29] Water Code section 10562(b)(4).
[30] Jurisdictional Runoff Management Program, *supra* fn. 25, page 8-2.

and the public were encouraged to review and provide comments on both before they were submitted for approval by the City Council.[31]

56.     Fifth, the City's plan and beneficial uses are consistent with, and assist in, compliance with total maximum daily load (TMDL) implementation plans and applicable national pollutant discharge elimination system (NPDES) permits,[32] and the City's plan and beneficial uses are consistent with all applicable waste discharge permits.[33]

57.     The San Diego Bay Watershed WQIP explains that it was developed by the Responsible Parties in the San Diego Bay Watershed Management Area to satisfy the requirements of the National Pollutant Discharge Elimination System Permit and Waste Discharge Requirements for Discharges from the Municipal Separate Storm Sewer Systems (MS4) Draining the Watersheds within the San Diego Region (Order No. R9-2013-0001).[34] In addition, the City created and updates a Jurisdictional Runoff Management Plan to meet the permit requirements.[35]

58.     Sixth, the City prioritizes the use of lands and easements in public ownership for stormwater and dry weather runoff projects.[36]  For example, page 6-5 of the City's Jurisdictional Runoff Management Plan explains that "[m]unicipal facilities are prioritized based on their threat to water quality which takes into consideration a variety of site-specific factors including:

- Type of municipal area or activity
- Materials used
- Wastes generated

---

[31] *Id*. at pg. 8-14.
[32] Water Code section 10562(b)(5).
[33] Water Code section 10562(b)(6).
[34] San Diego Bay Water Quality Improvement Plan, *supra* fn. 24, page 15.
[35] Jurisdictional Runoff Management Program, *supra* fn. 25, page ES-1.
[36] Water Code section 10562(b)(8).

- Pollutant discharge potential . . .
- Non-storm water discharges
- Size of facility or area
- Proximity to receiving water bodies
- Sensitivity of receiving water bodies
- Any other relevant factors
- Compliance history"

59.     Water Code Section 10562(d) guides cities' to identify opportunities to use stormwater as a beneficial resource.

60.     First, the City has identified opportunities to augment local water supply through groundwater recharge and storage for beneficial use of stormwater and dry weather runoff.[37]   For example, Chula Vista's BMP Design Manual identifies "harvest and use BMPs," which "capture and stores stormwater runoff for later use," while also recharging groundwater.[38]  The BMP Design Manual also identifies rain barrels, which allows for storage of runoff to be used for irrigation.[39]

61.     Second, the City has identified opportunities for source control for both pollution and stormwater and dry weather runoff volume; onsite and local infiltration; and use of stormwater and dry weather runoff.[40]   Source control includes activities such as "street sweeping"[41] and other best management practices (BMPs) "that reduce storm water pollutants of concern in urban runoff, including storm drain stenciling and signage, properly designed material and trash storage areas, and use of efficient irrigation systems."[42] Infiltration opportunities include a multitude of Low Impact Development (LID) BMPs that "maximize infiltration,

[37] Water Code section 10562(d)(1).
[38] BMP Design Manual, *supra* fn. 5, at page 4-13.
[39] Id.
[40] Water Code section 10562(d)(2).
[41] Jurisdictional Runoff Management Program, *supra* fn. 25, page 6-7.
[42] *Id*. at 4-13.

provide retention, slow runoff, minimize impervious footprint, direct runoff from impervious areas into landscaping, and construct impervious surfaces to minimum widths necessary."[43]   The City identifies opportunities for the use of stormwater and dry weather runoff, including recharging groundwater and irrigating landscaped areas.[44]

62.   Third, the City identifies projects to reestablish natural water drainage treatment and infiltration systems, or mimic natural system functions to the maximum extent feasible.[45]   Encouraging the use of natural channels that simulate natural drainage is a stated policy of the City of Chula Vista,[46] and the City identifies strategies and best practices for natural water drainage treatment and infiltration systems in its Jurisdictional Runoff Management Program and in its BMP Design Manual.

63.   Fourth, the City has identified opportunities to develop, restore, or enhance habitat and open space through stormwater and dry weather runoff management, including wetlands, riverside habitats, parkways, and parks.[47]

64.   Fifth, the City has identified opportunities to use existing publicly owned lands and easements, including, but not limited to, parks, public open space, community gardens, farm and agricultural preserves, schoolsites, and government office buildings and complexes, to capture, clean, store, and use stormwater and dry weather runoff either onsite or offsite.[48]   For example, the City has developed a water-shed based inventory of municipal properties[49] and activities and

---

[43] *Id.*
[44] BMP Design Manual, *supra* fn. 5, at page 4-13.
[45] Water Code section 10562(d)(3).
[46] City of Chula Vista General Plan, Chapter 8 "Public Facilities & Services Element," Page PFS-12 (http://www.chulavistaca.gov/departments/development-services/planning/general-plan; last accessed May 6, 2018).
[47] Water Code section 10562(d)(4).
[48] Water Code section 10562(d)(5).
[49] Jurisdictional Runoff Management Program, *supra* fn. 25, pages 6-4 through 6-5.

"implements BMPs at municipal areas and during municipal activities to decrease or potentially eliminate pollutants that originate from a specific area and/or activity[50]."

65.     Sixth, the City provides design criteria and best management practices in accordance with Water Code section 10562(d)(6).  These design criteria and BMPs are covered throughout the City's watershed and stormwater plans, including in the City's Jurisdictional Runoff Management Program and its BMP Design Manual For Permanent Site Design, Storm Water Treatment and Hydromodification Management.

66.     Finally, the City's many plans and activities, exemplified above, satisfy Water Code sections 10562(d)(7) –(9).  Chula Vista identifies activities that generate or contribute to pollution of stormwater or dry weather runoff throughout their BMP Design Manual and Jurisdictional Runoff Management Program.  The City's BMP Design Manual provides decision support tools to ensure effective implementation of the City's stormwater plans. The Jurisdictional Runoff Management Program (JRMP) identifies multiple ways that Plaintiff ensures implementation and compliance with Plaintiff's stormwater management plans; for example, the JRMP identifies that the City performs inspections of construction sites and industrial facilities, among other types of locations, to ensure effective implementation of the City's stormwater plans.

## VIII.  FACTUAL ALLEGATIONS

### A. PCBs are Toxic Chemicals that Cannot Be Contained and that Cause Environmental Contamination.

67.     Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring).  A "PCB congener" is any single, unique chemical compound in the PCB category.

---

[50] *Id*. at pages 6-13 through 6-14

Over two hundred congeners have been identified.[51]

68.    PCBs were generally manufactured as mixtures of congeners.  From approximately 1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally produced PCBs for commercial use.[52]  The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

69.    Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States, including electrical equipment such as transformers, motor start capacitors and lighting ballasts.  In addition, PCBs were incorporated into a variety of products such as caulks, paints and sealants.

70.    As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

71.    PCBs easily migrate or leach out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil and other materials.  For example, PCB compounds volatilize out of building materials (such as caulk) into surrounding materials such as masonry, wood, drywall and soil, thereby causing damage to those surrounding materials.  PCBs can also escape from totally-enclosed materials (such as light ballasts) and similarly contaminate and damage surrounding materials and escape into the environment.

---

[51]  Table of PCB Congeners, available at https://www.epa.gov/pcbs/table-polychlorinated-biphenyl-pcb-congeners (last accessed April 26, 2018).

[52]  *See* 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned ... ."); 121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co. ... ."). *See also* MONS 058730-058752 at 058733 (identifying other producers as "all ex-USA."), attached as Exhibit A.

72.    PCBs present serious risks to the health of humans, wildlife and the environment.

73.    Humans may be exposed to PCBs through ingestion, inhalation and dermal contact.  Individuals may inhale PCBs that are emitted into the air.  They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks.  And humans may absorb PCBs from physical contact with PCBs or PCB-containing materials.

74.    EPA has determined that Monsanto's PCBs are probable human carcinogens.  In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254 and 1260.[53]  EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

75.    The International Agency for Research on Cancer published an assessment in 2015 that asserts an even stronger relationship between PCBs and human cancer.  The report explains:  "There is sufficient evidence in humans for the carcinogenicity of polychlorinated biphenyls (PCBs). PCBs cause malignant melanoma. Positive associations have been observed for non-Hodgkin lymphoma and cancer of the breast. ... PCBs are carcinogenic to humans ... ."[54]

76.    In addition, EPA concluded that PCBs are associated with serious non-cancer health effects.  From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive

---

[53]   EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=12486 (last accessed April 26, 2018).

[54] International Agency for Research on Cancer.  IARC monographs on the evaluation of carcinogenic risks to humans, volume 107.  Polychlorinated and Polybrominated Biphenyls (2015), available at http://monographs.iarc.fr/ENG/Monographs/vol107/ (last accessed April 26, 2018).

system, the nervous system and the endocrine system.

77.    PCBs are known to be toxic to a number of aquatic species and wildlife including fish, marine mammals, reptiles, amphibians and birds.  The presence of PCBs can cause changes in community and ecosystem structure and function.[55]

**B. Monsanto Has Long Known of PCBs' Toxicity.**

78.    Monsanto was well aware of scientific literature published in the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects.[56]

79.    An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects.  Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[57]

80.    A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with respect to PCB toxicity:  "We know Aroclors are toxic but the actual limit has not been precisely defined.  It does not make too much difference, it seems to me, because our main worry is what will happen if an individual developes [*sic*] any type of liver disease and gives a history of Aroclor exposure.  I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[58]

81.    On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

---

[55] *See* EPA, Understanding PCB Risks, available at https://www.epa.gov/ge-housatonic/understanding-pcb-risks-ge-pittsfieldhousatonic-river-site  (last accessed April 26, 2018).
[56] *See* Exhibits B, C and F.
[57] MONS 061332, attached as Exhibit B.
[58] MONS 095196-7, attached as Exhibit C

> It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties.  While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[59]

82.   On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors:  "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 [which contained PCBs] is just too toxic for use in a submarine."[60]

83.   In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[61]  Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[62]  Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[63]

84.   At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB compounds.  In a 1960 brochure, Monsanto promoted the use of Aroclors in transformers and capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire or cable coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens, thermostats, furnaces and vacuum

---

[59]  Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number), attached as Exhibit D.
[60] MONS 095640, attached as Exhibit E.
[61] *See* JDGFOX00000037-63, attached as Exhibit F.
[62] *Id*. at JDGFOX00000039.
[63] *Id*. at JDGFOX00000037.

diffusion pumps.  Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil; insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics; sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers; masonry coatings for swimming pools, stucco homes, and highway paints;  protective and decorative coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment; and coatings for chemical plants, boats, and highway marking.[64]

85.    A 1961 brochure explained that Monsanto's Aroclors were being used in "lacquers for women's shoes," as "a wax for the flame proofing of Christmas trees," as "floor wax," as an adhesive for bookbinding, leather, and shoes, and as invisible marking ink used to make chenille rugs and spreads.[65]

86.    Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods.  Moreover, Monsanto affirmatively encouraged these uses by encouraging salesmen to market products for these and other applications.

87.    Years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years before.  In a press release, the company claimed:  "What should be emphasized ... is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item."[66]

---

[64] The Aroclor Compounds (hand-dated May 1960), 0509822-66, attached as Exhibit S.
[65] Plasticizer Patter (February 1961), 0627503-21, attached as Exhibit T.
[66] *See* Press release (July 16, 1970), MCL000647-50, attached as Exhibit U, at MCL000648.

88.    In 1975, William Papageorge, then Monsanto's manager of product acceptability, admitted that PCBs had been used in all types of products. Papageorge testified at a Public Hearing Before the Department of Natural Resources that "[t]he past uses [of PCBs] . . . were many and varied. . . . They go on and on.  Virtually anything you can imagine, at one time or other, someone tried PCB's in them."[67]

### C. Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.

89.    Monsanto also knew that PCBs were causing widespread contamination of the environment, far beyond the areas of its use.[68]

90.    Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen, who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[69]  The report noted that PCBs were also detected in the air over London and Hamburg and found in seals caught off the coast of Scotland. Jensen concluded that PCBs can "be presumed to be widespread throughout the world."[70]

91.    A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[71]   The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine falcons and 34 other bird species.  The report linked PCBs to the rapid decline in peregrine falcon populations in the United States.

---

[67] *See* Declaration of Kathleen L. Roach, Exhibit 43, (Document 681-43), *Appleton Papers, Inc. and NCR Corp. v. George A. Whiting Paper Co*., Case 2:08-cv-00016-WCG (E.D. Wis.), attached as Exhibit V.

[68] *See* Exhibits G, H and L.

[69] New Scientist (Dec. 15, 1966), MONSFOX00003427, attached as Exhibit G.

[70] *Id*.

[71] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968), attached as Exhibit H.

92.    Despite growing evidence of PCBs' infiltration of every level of the global ecology, Monsanto remained steadfast in its production of Aroclors and other PCBs.

93.    On March 6, 1969, Monsanto Research Center employee W.R. Richard wrote a memorandum discussing Risebrough's article that criticized PCBs as a "toxic substance," "widely spread by air-water; therefore, an uncontrollable pollutant ... causing extinction of peregrine falcon … [and] endangering man himself."[72]    Richard explained that Monsanto could take steps to reduce PCB releases from its own plants but cautioned, "It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper.  In this applications exposure to consumers is greater and the disposal problem becomes complex."[73]

94.    On September 9, 1969, W.R. Richard, by then a member of the newly-formed Aroclor "Ad Hoc" Committee, wrote an interoffice memo titled "Defense of Aroclor."[74]  He acknowledged the role of Aroclor in water pollution: "Aroclor product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a long life."  He noted that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida causing a problem with shrimp; in San Francisco Bay, where it was reported to thin egg shells in birds; and in the Great Lakes.  Richard advised that the company could not defend itself against all criticism:  "We can't defend vs. everything.  Some animals or fish or insects will be harmed.  Aroclor degradation rate will be slow.  Tough to defend against.  Higher chlorination compounds will be worse [than] lower chlorine compounds.

---

[72] MONS 096509-096511, attached as Exhibit I.
[73] *Id.*
[74] DSW 014256-014263, attached as Exhibit J.

Therefore we will have to restrict uses and clean-up as much as we can, starting immediately."[75]

95.    On January 29, 1970, Elmer Wheeler of Monsanto's Medical Department and Chairman of the Aroclor "Ad Hoc" Committee circulated laboratory reports discussing results of animal studies.    He noted:    "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated.    Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."[76]

96.    In a PCB Presentation to Corporate Development Committee, Monsanto expressed a desire to keep profiting from PCBs despite the environmental havoc.    The report suggests possible reactions to the contamination issue.    It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint."    But the option of going out of the Aroclor business was also considered unacceptable:    "there is too much customer/market need and selfishly too much Monsanto profit to go out."[77]

97.    Monsanto formed an "Aroclor 'Ad Hoc' Committee" to investigate the pollution caused by PCBs.    The Aroclor "Ad Hoc" Committee held its first meeting on September 5, 1969.    The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant."[78]    The meeting minutes acknowledge that PCB has been found in fish, oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife.    Moreover, the committee implicated the normal use of PCB-

---

[75] *Id.*
[76] MONS 098480, attached as Exhibit K.
[77] Ex. A at 058737.
[78] Ex. L at 030483.

containing products as the cause of the problem:  "In one application alone (highway paints), one million lbs/year [of PCBs] are used.  Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."[79]

98.   A month later, on October 2, 1969, the Committee reported extensive environmental contamination.  The Committee advised that Monsanto could not protect the environment from Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors:

> The committee believes that there is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated -- e.g. Aroclors 1254 and 1260) as nearly <u>global environmental contaminants</u> leading to <u>contamination of human food</u> (particularly fish), the <u>killing of some marine species</u> (shrimp), and the possible extinction of several species of fish eating birds.
>
> Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent completely some environmental contamination.
>
> <u>There are, however, a number of actions</u> which must be undertaken <u>to prolong the manufacture, sale and use of these particular Aroclors</u> as well as to protect the continued use of other members of the Aroclor series.[80]

99.   Monsanto's desire to protect its Aroclor profits rather than the environment is reflected in the Committee's stated objectives:

> 1.   Protect continued sales and profits of Aroclors;
> 2.   Permit continued development of new uses and sales, and
> 3.   Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem.[81]

---

[79] *Id*. at 030485.
[80] DSW 014612-014624, at 014615, attached as Exhibit M (emphasis added).
[81] *Id*. at 014614.

100.   An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260:   "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment."   Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business."   To that end, it says, "We want to avoid any situation where a customer wants to return fluid. ... We would prefer that the customer use up his current inventory and purchase [new products] when available. He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system.  We don't want to take fluid back."[82]

101.   Instead of having customers return fluids, Monsanto instructed its customers to dispose of PCB containing material in local landfills, knowing that landfills were not suitable for PCB contaminated waste.  Monsanto had determined that the only effective mothed of disposing of PCBs was incineration, and it constructed an incinerator for disposal of its own PCB contaminants. Nevertheless, as William Papageorge explained in his 1975 testimony before the Department of Natural Resources,   Monsanto instructed its customers to dispose of PCB contaminated waste in landfills: "lacking that resource [a commercial incinerator], we have to reluctantly suggest, because we don't have a better answer, that they find a well operated, properly operated landfill and dispose of the material in that fashion."[83]

102.   In 1970, the year after Monsanto formed the "ad hoc" committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

---

[82] MONS 100123-100124, attached as Exhibit N.
[83] Exhibit V at 29.

103.   Growing awareness of the ubiquitous nature of PCBs led the United States to conduct an investigation of health and environmental effects and contamination of food and other products.   An interdepartmental task force concluded that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health.[84]

104.   After that report, environmental sampling and studies indicated that PCBs were a "more serious and continuing environmental and health threat than had been originally realized."[85]   To address these concerns, EPA undertook a study to assess PCB levels in the environment on a national basis.   That study revealed widespread occurrence of PCBs in bottom sediments in several states, including California.[86]

105.   EPA's study noted the particular burden on California.   "PCBs have become a significant component of the marine food webs of southern California," were found in sediments in the Santa Barbara Basin, and found in high levels in the San Francisco Bay.[87]

**D. Monsanto Concealed the Nature of PCBs from Governmental Entities.**

106.   While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite – that the compounds were not toxic and that the company would <u>not</u> expect to find PCBs in the environment in a widespread manner.[88]

---

[84] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976), available at http://nepis.epa.gov (search "560776001") (last accessed April 26, 2018).

[85] *Id*. at 1.

[86] *Id*., *passim.*

[87] *Id*. at 78-9.

[88] *See* Exhibits O-R (letters to governmental agencies).

107.   In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[89]   Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry."[90]   A similar letter to the San Francisco Bay Regional Water Quality Control Board explained that PCB plasticizers (found in surface coatings, such as paints, industrial adhesives and window sealants), in normal use, present no special health problems" and that, "[i]n view of PCB's chemical inertness, we would anticipate no problems associated with the environment from refuse dumps."[91]

108.   In May 1969, Monsanto's Manager, Environmental Health, Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."[92]

109.   Monsanto delivered the same message to the New Jersey Department of Conservation in July 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."[93]   The letter then reiterates Monsanto's position regarding environmental

---

[89] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969), attached as Exhibit O.
[90] Id.
[91] Letter from Monsanto to State of California Resources Agency (March 27, 1969), attached as Exhibit P.
[92] Monsanto Memorandum to W.R. Richard (May 26, 1969), attached as Exhibit Q.
[93] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969), attached as Exhibit R.

contamination:  "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[94]

110.  At the same time that Monsanto was downplaying the toxicity of PCBs and inevitable widespread contamination caused by PCBs, its Aroclor "Ad Hoc" Committee acknowledged that there was nothing that could be done to prevent PCBs from becoming a global contaminant leading to contamination of the food supply, injuring marine life and possibly leading to the extinction of certain bird species.  The committee reported on the probability of success of actions Monsanto might undertake to address the PCB problem and provided:

> The committee believes there is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls … as nearly global environmental contaminants leading to the contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.[48]

111.  Moreover, the committee acknowledged that no course of action could be taken to prevent products containing PCBs from contaminating the environment, particularly waters and the marine environment.  The committee explained "the committee believes that there is no possible course of action that can so effectively police the uses of these PCB containing products as to prevent completely some environmental contamination."[95]  Further, the committee reported concern that vapor losses from PCB containing products likely results in contamination of an aquatic environment because based on published reports

---

[94] *Id.*

[95] DSW 014612-014624, at 014615, attached as Exhibit M.

"even minute quantities of [PCB] vapors are eventually transferred to the water environment and accumulated therein."[96]

112.   Exactly as Monsanto's committee had acknowledged, PCBs have become a global contaminant and have accumulated in the waters of the Bay to the point where they are a public nuisance and require remediation and abatement.

**E.  The San Diego Bay is a 303(d) Impaired Body of Water for PCBs.**

113.   The Bay is one of the region's most widely used natural resources, and the PCB contamination affects all Chula Vistans, who reasonably would be disturbed by the presence of a hazardous, banned substance in the sediment, water, and wildlife.

114.   PCBs (specifically, Aroclor compounds 1254 and 1260) have been found in samples of sediments and water taken from the Bay at varying times and locations, requiring substantial remediation work and cost.  In addition, PCBs have been identified in tissues of fish and lobster in the Bay.

115.   Currently, Plaintiff anticipates being named in a California Regional Water Quality Control Board Cleanup and Abatement Order in part of the San Diego Bay due to the presence and contamination of Monsanto's PCBs.

116.   The Regional Water Board estimated human health risks due to the consumption of PCB contaminated fish tissue found in the Bay and employed human fish consumption rates and bioaccumulation factors in the analysis.

117.   The Regional Water Board also concluded that human ingestion of seafood caught within certain assessment areas can significantly increase cancer risk, specifically identifying PCBs as a carcinogenic chemical.

118.   PCBs have entered the Bay through various sources.  PCBs leach from landfills and are found in commercial and industrial waste water as a result of Monsanto's directions to its customers on proper disposal methods when it knew,

---

[96] *Id*. at DWS 014618.

in fact, that disposal of PCBs in landfills was not proper.  PCBs also leach out of paints, caulk, sealants and other applications and are transported by air and water to the Bay.  Plaintiff also manages and operate a municipal stormwater system, which collects and transports stormwater to be discharged into the Bay.  In order to discharge stormwater into the Bay, Plaintiff is required to receive a Municipal Regional Stormwater Permit from the Regional Water Board, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act.

119.   As stormwater system owners and operators, Plaintiff has spent substantial amounts of money to limit the amount of PCBs in the Bay.  Plaintiff will also likely continue to incur costs to remove PCBs from the Bay and to keep PCBs from entering the Bay for the foreseeable future.

120.   PCBs are a substantial factor in causing the City to incur costs and damages to retrofit its system. Plaintiff will continue to suffer damages and injuries as it will continue to retrofit its system to prevent the health hazard caused by PCBs in the Bay.

121.   Monsanto's conduct, as set forth above, was committed with malice, oppression and/or fraud, as those terms are defined in Civil Code § 3294. Monsanto's conduct was despicable and in conscious disregard to the rights and safety of others, including Plaintiff.  Monsanto's despicable conduct has subjected unjust hardship in conscious disregard to Plaintiff, who is the former trustee of waters, sediments, and tideland properties in and surrounding the Bay.  Defendants intentionally misrepresented and concealed material facts from governmental entities in the state with the intent of causing injury.  In addition to Plaintiff's entitlement to actual damages and request for abatement, Plaintiff is entitled to recover exemplary damages.

///

///

///

# FIRST CAUSE OF ACTION

## CONTINUING PUBLIC NUISANCE

122.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

123.   Monsanto manufactured, distributed, marketed and promoted PCBs in a manner that created or participated in creating a continuing public nuisance that is harmful to health and obstructs the free use of the Bay.  Monsanto also directed its customers and the public to dispose of PCB containing materials improperly, resulting in PCBs leaching from landfills and entering the Bay.

124.   The presence of PCBs interferes with the comfortable enjoyment of the Bay for its customary uses for commercial and sport fishing, swimming and other water activities.

125.   The presence of PCBs interferes with the free use of the Bay for the promotion of commerce, navigation and fisheries.

126.   The presence of PCBs interferes with the free use of the Bay for ecological preservation and habitat restoration.

127.   The San Diego Bay is listed as impaired due to PCB, pursuant to the Clean Water Act and the 303(d) list.

128.   The Regional Water Board found that the presence of PCBs in San Diego Bay meets all three criteria for a "nuisance" as defined by California Water Code section 13050 (m) because it: (1) is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; (2) affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal; and (3) occurs during, or as a result of, the treatment or disposal of wastes.

129.   The presence of PCBs adversely affects the quality of water in the

Bay and causes inconvenience and annoyance to any reasonable person.

130.   The condition affects a substantial number of people who use the Bay for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe resources and environment.

131.   An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals and humans and degrade water quality and destroy marine habitats.

132.   The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

133.   Plaintiff has suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, because the City owns and operates a stormwater system that requires stormwater retrofits to manage, remove, and reduce Monsanto's PCBs.

134.   Plaintiff did not consent to the conduct that resulted in the nuisance.

135.   Monsanto's conduct was a substantial factor in causing the harm to the City.  Without relief, Plaintiff will continue to suffer injuries, and the hazards caused by PCBs will continue.

136.   Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing the type of contamination now found in the Bay.  Monsanto knew that PCBs would leach out of products and escape into the environment, that there was no way to contain PCBs and prevent such escape, and that PCBs would accumulate in an aquatic environment like the Bay.  Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish species, and would endanger birds and animals.  In addition, Monsanto knew that PCBs are associated with serious illnesses and cancers in humans and knew that humans may be exposed to PCBs through ingestion and dermal contact.  As a result, it was

foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters or by eating fish from those waters.  Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any coastal marine areas.

137.   As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiff has suffered and continues to suffer actual damages and injuries to property requiring abatement and other costs to be determined at trial.

## **PRAYER FOR RELIEF**

Plaintiff prays for judgment that Defendants are liable to the City, jointly and severally, for creation of the public nuisance and must pay as follows:

1) Any and all compensatory damages according to proof;

2) Punitive damages;

3) Litigation costs and attorney's fees as provided by law;

4) Pre-judgment and post-judgment interest;

5) Any other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

1

## **<u>DEMAND FOR JURY TRIAL</u>**

2        Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the

3  Federal Rules of Civil Procedure.

4

5  Dated:  August 21, 2018            Respectfully submitted,

6

7

8                          By:  s/ John P. Fiske _____

9                          **BARON & BUDD, P.C.**
10                          Scott Summy (admitted Pro Hac Vice)
                           Carla Burke Pickrel (admitted Pro Hac Vice)
11                          Celeste Evangelisti (SBN 225232)
12                          John P. Fiske (SBN 249256)
                           jfiske@baronbudd.com
13                          Jason J. Julius (SBN 249036)

14
                           **OFFICE OF THE CITY ATTORNEY**
15                          Glen Googins, City Attorney
                           California State Bar No. 137977
16                          Bart Miesfeld, Senior Assistant City Attorney
                           California State Bar No. 126056
17                          276 4th Ave
                           Chula Vista, CA 91910-2631
18                          Telephone: 619-691-5037

19
20                          ***Attorneys for the City of Chula Vista***

21

22

23

24

25

26

27

28