UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF CHULA VISTA, a municipal corporation,<br><br>Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY, SOLUTIA INC., PHARMACIA CORPORATION,<br><br>Defendants. | Case No.: 18cv1942-WQH-AGS<br><br>**ORDER** |

HAYES, Judge:

The matter before the Court is the motion to dismiss or stay filed by Defendants. (ECF No. 5).

**I.  BACKGROUND**

On August 21, 2018, Plaintiff City of Chula initiated this action by filing a Complaint against Defendants Monsanto Company, Solutia Inc., and Pharmacia Corporation. (ECF No. 1). Plaintiff brings a claim for continuing public nuisance, alleging that Defendants are responsible for damage to Plaintiff's stormwater system caused by polychlorinated biphenyls (PCBs).

1

On September 14, 2018, Defendants filed a Motion to Dismiss or Stay based on Plaintiff's failure to exhaust administrative remedies. (ECF No. 5).

On October 16, 2018, Plaintiff filed a Response in Opposition to the Motion to Dismiss. (ECF No. 16).

On October 29, 2018, Defendants filed a Reply in support of the Motion to Dismiss. (ECF No. 20).

## II.  ALLEGATIONS OF THE COMPLAINT

Plaintiff is a "California Charter City and municipal corporation." (ECF No. 1 ¶ 9). "The City was a trustee of certain relevant tidelands and submerged lands in and around the [San Diego] Bay from the early 1900s through 1963, when that property was transferred to the Port District." *Id.*

Defendants Monsanto Company, Pharmacia LLC, and Solutia Inc. are three separate corporations spun off from the original Monsanto Company. *Id.* ¶ 15. "Monsanto Company has repeatedly held itself out as the sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name 'Aroclor' for certain PCB compounds." *Id.* ¶ 2.

"Polychlorinated biphenyls (or 'PCBs') are man-made chemical compounds that have become notorious as global environmental contaminants – found in bays, oceans, rivers, streams, soil, and air." *Id.* ¶ 1. "In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects." *Id.*

"Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States, including electrical equipment such as transformers, motor start capacitors and lighting ballasts. In addition, PCBs were incorporated into a variety of products such as caulks, paints and sealants." *Id.* ¶ 69. "PCBs easily migrate or

leach out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil, and other materials." *Id.* ¶ 71.

Despite knowledge of PCB toxicity, Monsanto continued to "promot[e] the use and sale of Aroclor and other PCB compounds." *Id.* ¶ 84. "Monsanto remained steadfast in its production of . . . PCBs." *Id.* ¶ 92. "While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities . . . that the compounds were not toxic and that the company would not expect to find PCBs in the environment in a widespread manner." *Id.* ¶ 106. "Although Monsanto knew for decades that PCBs were toxic, knew that they could not be contained and as a result were widely contaminating all natural resources and living organisms, and knew that there was no safe way to dispose of PCBs, Monsanto concealed these facts and continued producing PCBs until Congress . . . banned the manufacture of and most uses of PCBs as of January 1, 1979." *Id.* ¶ 2.

"Instead of having customers return fluids, Monsanto instructed its customers to dispose of PCB containing material in local landfills, knowing that landfills were not suitable for PCB contaminated waste." *Id.* ¶ 101. "Monsanto had determined that the only effective m[e]th[o]d of disposing of PCBs was incineration, and it constructed an incinerator for disposal of its own PCB contaminants." *Id.* "Nevertheless . . . Monsanto instructed its customers to dispose of PCB contaminated waste in landfills . . . ." *Id.*

"PCBs have traveled into the City of Chula Vista's stormwater system and San Diego Bay in a variety of ways." *Id.* ¶ 4. "The Bay is one of the region's most widely used natural resources, and the PCB contamination affects all Chula Vistans, who reasonably would be disturbed by the presence of a hazardous, banned substance in the sediment, water, and wildlife." *Id.* ¶ 113. "PCBs . . . have been found in samples of sediments and water taken from the Bay at varying times and locations, requiring substantial remediation work and cost." *Id.* ¶ 114. "PCBs leach from landfills and are

found in commercial and industrial waste water as a result of Monsanto's directions to its customers on proper disposal methods when it knew . . . that disposal of PCBs in landfills was not proper." *Id.* ¶ 118. "PCBs regularly leach, leak, off-gas, and escape their intended applications, causing runoff during naturally occurring storm and rain events, after being released into the environment. The runoff originates from multiple sources and industries and enters the City of Chula Vista's stormwater system and San Diego Bay through stormwater and dry weather runoff." *Id.* ¶ 4.

"The City has property rights in its stormwater system, captured stormwater, and tidelands or submerged lands, and other public trust lands that are contaminated with Monsanto's PCBs, to the extent the City of Chula Vista owns or holds lands in public trust." *Id.* ¶ 23. "The City owns, manages, and operates a municipal stormwater and dry weather runoff system, which captures, collects, reuses for beneficial purposes, and/or transports stormwater and dry weather runoff." *Id.* ¶ 24. "Monsanto's PCBs have contaminated and damaged multiple facilities within the City's stormwater and dry weather runoff systems." *Id.* ¶ 25. "As a result of Monsanto's PCB's presence, the City cannot operate many of its stormwater and dry weather runoff systems as designed because the system now requires upgrades and retrofits to accommodate Monsanto's PCBs." *Id.* ¶ 26. "The City has incurred and will continue to incur costs to reduce PCBs from stormwater and dry weather runoff, which includes efforts to capture and beneficially use stormwater and dry weather runoff to augment existing water supplies." *Id.* ¶ 27. "The City's stormwater and dry weather runoff management system is damaged such that multiple facilities within the City's system have been and must be further retrofitted and improved in order to reduce and remove PCBs from stormwater and dry weather runoff. The retrofits and improvements required to reduce PCBs from stormwater and dry weather runoff have cost and will continue to cost the City money." *Id.* ¶ 28. "Retrofits . . . are required to reduce

4

and remove Monsanto's PCBs to prevent further contamination of the San Diego Bay." *Id.* ¶ 31.

The municipal stormwater system "collects and transports stormwater to be discharged into the Bay." *Id.* ¶ 118. "In order to discharge stormwater into the Bay, Plaintiff is required to receive a Municipal Regional Stormwater Permit from the Regional Water Board, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act." *Id.* "As stormwater system owners and operators, Plaintiff has spent substantial amounts of money to limit the amount of PCBs in the Bay. Plaintiff will also likely continue to incur costs to remove PCBs from the Bay and to keep PCBs from entering the Bay for the foreseeable future." *Id.* ¶ 119.

California's Stormwater Resources Planning Act "authorizes the City to develop a stormwater resource plan, including compliance with stormwater regulations and beneficial capture of stormwater" and "confer[s] use or usufructuary rights on the City," "regarding . . . dry weather runoff and stormwater." *Id.* ¶¶ 38–39. Further, in Assembly Bill 2594, "the California State Legislature unanimously passed legislation confirming and codifying the Cities' use rights in stormwater." *Id.* ¶ 34. "The City built, owns, and manages an entire stormwater system, including plans and programs designed and intended to capture stormwater for beneficial uses outlined in The Stormwater Resources Planning Act . . . ." *Id.* ¶ 48. "The City has a usufructuary right and property interest in stormwater and dry weather runoff by its beneficial capture and use of stormwater." *Id.* ¶ 47.

### III. APPLICABLE STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." In order to state a claim for relief, a pleading "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under Rule 12(b)(6) "is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support

a cognizable legal theory." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (quotation omitted).

Stating a claim for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). When considering a motion to dismiss, a court must accept as true all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "[A]ccepting all factual allegations in the complaint as true and drawing 'all reasonable inferences in favor of the nonmoving party,'" the plaintiff's "allegations must 'plausibly suggest an entitlement to relief.'" *Gregg v. Haw., Dep't of Pub. Safety*, 870 F.3d 883, 886–87 (9th Cir. 2017) (first quoting *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999); then quoting *Iqbal*, 556 U.S. at 681).

## IV. REQUEST FOR JUDICIAL NOTICE

Monsanto requests judicial notice of the following documents: (1) Excerpts of "Polychlorinated Biphenyls and the Environment," a report issued by the United States Department of Agriculture, Interdepartmental Task Force, issued May 1972 ("PCB Report"); (2) Excerpts of California Regional Water Quality Control Board, Order No. R9-2007-0001, NPDES No. CAS0108758, dated January 24, 2007 ("2007 Permit"); (3) Excerpts of California Regional Water Quality Control Board, Order No. R9-2013-0001, NPDES No. CAS0109266, dated May 8, 2013 ("2013 Permit"); (4) Excerpts of California Regional Water Quality Control Board, Order Nos. R9-2015-0001, R9-2015-0100, NPDES No. CAS0109266, dated Nov. 18, 2015 ("2015 Permit"); (5) Excerpts of Test Claim No. 07-TC-09, filed by San Diego County, *Cal. Water Quality Control Bd., San Diego Region*, Order No. R9-2007-0001, dated June 20, 2008 ("2008 Test Claim"); (6) Statement of Decision issued by the Commission on State Mandates, *In re Test Claim on San Diego Reg'l Water Quality Control Bd., Order No. R9-2007-0001, Permit CAS0108758*, dated March 26, 2010 ("Statement of Decision"); (7) Excerpts of Test Claim

No. 14-TC-03, filed by San Diego County, *Test Claim of San Diego County re San Diego RWQCB Order No. R9-2013-0001*, dated June 29, 2015 ("2015 Test Claim"); (8) Excerpts of Test Claim No. 15-TC-02, filed by Orange County Flood Control District, *Joint Test Claim of Orange County, et al. re San Diego RWQCB Order No. R9-2015-0001*, dated June 30, 2016 ("2016 Test Claim"); (9) Declaration of Khosro Aminpour, City of Chula Vista, filed in the 2008 Test Claim, dated June 12, 2008 ("2008 City Declaration"); (10) Supplemental Declaration of Khosro Aminpour, City of Chula Vista, filed in the 2008 Test Claim, dated February 24, 2010 ("2010 City Declaration"); (11) Excerpts of a BMP Design Manual, originally issued by the City of Chula Vista in December 2015, and updated May 2017 ("City BMP Design Manual"); (12) Excerpts of the San Diego Bay Watershed Management Area Water Quality Improvement Plan, submitted to the San Diego Regional Water Quality Control Board, dated June 2015 ("San Diego Bay WQIP"); and (13) Excerpts of a Jurisdictional Runoff Management Program, originally issued by the City of Chula Vista in June 2015, and updated January 2018 ("City JRMP").

Defendants contend that these documents may be properly considered on this motion to dismiss under the doctrine of incorporation by reference and as public records under Federal Rule of Evidence 201.

"Generally, a court may not consider material beyond the complaint in ruling on a Fed. R. Civ. P. 12(b)(6) motion. . . . However, a court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment, as long as the facts noticed are not subject to reasonable dispute." *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007) (quotation and alteration omitted). "The court may judicially notice a fact that is not subject to reasonable dispute because it . . . is generally known within the trial court's territorial jurisdiction; or . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed R. Evid. 201(b). A court "may take judicial notice of

'records and reports of administrative bodies.'" *Anderson v. Holder*, 673 F.3d 1089, 1094 (9th Cir. 2012) (quotation omitted).

The docket reflects that Plaintiff has not filed any opposition to this Request for Judicial Notice. The Court concludes that these documents are matters of public record properly subject to judicial notice. *See* Fed. R. Evid. 201; *Intri-Plex Techs.*, 499 F.3d at 1052; *S.F. Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 732 (N.D. Cal. 2011) ("It is well established that records, reports, and other documents on file with administrative agencies—such as the State Water Resources Control Board—are judicially noticeable."). Defendants' request for judicial notice is granted.

## V. DISCUSSION

Defendants contend that the Complaint should be dismissed or stayed pending resolution of test claims because Plaintiff "seeks to recover as tort damages the same permit compliance costs" for which Plaintiff is entitled to reimbursement as unfunded state mandates. (ECF No. 5-1 at 14, 17). Defendants list specific costs for which Plaintiff seeks recovery in this action as well as reimbursement from the Commission on State Mandates (Commission) in previous and current test claims; for example, watershed-wide management programs and hydromodification management plans. Defendants assert that the same state-mandated storm water discharge permit requirements at issue in this case were found to constitute unfunded state mandates subject to state reimbursement in *Department of Finance v. Commission on State Mandates*, 378 P.3d 356 (Cal. 2016), and *Department of Finance v. Commission on State Mandates*, 226 Cal. Rptr. 3d 846 (Ct. App. 2017). Defendants contend that the Court has discretion to dismiss or stay this matter pending resolution of the test claims through judicially imposed prudential exhaustion. Defendants contend that public policy considerations favor exhaustion. Defendants assert that "[a]waiting the completion of the Commission's proceedings will avoid double recovery, moot or substantially narrow the claims and damages at issue in this case—which

8

18cv1942-WQH-AGS

will correspondingly reduce the scope of discovery and motion practice—and it will result in a shorter, more streamlined trial." (ECF No. 5-1 at 8).

Plaintiff contends that the Commission is not authorized to address its public nuisance claim for tort damages or to award tort damages for the costs related to PCB contamination. Plaintiff contends that the conditions necessary to require administrative exhaustion under California law are not present in this case. Plaintiff asserts that no statute provides an administrative procedure and remedy for its nuisance claims and that the Court does not need agency assistance or expertise to determine its public nuisance claims. Plaintiff asserts that prudential exhaustion is impossible because decisions in this action are unaffected by any agency ruling on unfunded mandates. Plaintiff contends that public policy considerations weigh against exhaustion.

The California Constitution states that "if the legislature or a state agency requires a local government to provide a new program or higher level of service, the local government is entitled to reimbursement from the state for the associated costs." *Dep't of Fin.*, 378 P.3d at 360 (Cal. 2016) (citing Cal. Const. art. XIII B, § 6, subd. (a)). An exception to this requirement provides that "if the new program or increased service is mandated by a federal law or regulation, reimbursement is not required." *Id.* (citing Cal. Gov. Code § 17556, subd. (c)). "[T]he Legislature established the Commission as a quasi-judicial body to carry out a comprehensive administrative procedure for resolving claims for reimbursement of state-mandated local costs arising out of article XIIIB, section 6 . . . of the California Constitution." *Redev. Agency v. Comm'n on State Mandates*, 51 Cal. Rptr. 2d 100, 102 (Ct. App. 1996). "[T]hus the statutory scheme contemplates that the Commission, as a quasi-judicial body, has the sole and exclusive authority to adjudicate whether a state mandate exists." *Id.* (citing *Cty. of L.A. v. Comm'n on State Mandates*, 38 Cal. Rptr. 2d 304, 311 (Ct. App. 1995)).

9

In *Department of Finance*, the Regional Water Quality Control Board, a state agency, issued permits to the Los Angeles County Flood Control District and eighty-four cities to operate storm drainage systems with certain permit conditions requiring that the operators "take various steps to reduce the discharge of waste and pollutants into state waters." 378 P.3d at 361. Some of the drainage system operators sought reimbursement through the Commission for the cost of satisfying the conditions as an unfunded state mandate. The Commission determined that "each required condition was a new program or higher level of service mandated by the state rather than by federal law." *Id.* Upon review of the decision, the trial court and the court of appeal found that all of the requirements were federally mandated. *Id.* However, the California Supreme Court upheld the decision of the Commission and concluded that the permit conditions were not federally mandated. *Id.* at 371.

Under California law, "[w]here an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act." *Abelleira v. Dist. Court of Appeal*, 109 P.2d 942, 949 (Cal. 1941); *see also Campbell v. Regents of the Univ. of Cal.*, 106 P.3d 976, 982 (Cal. 2005). "[H]owever, this oft-quoted rule speaks only to the need to exhaust administrative remedies provided for a statutory right and does not govern rights and remedies outside the legislative scheme." *Rojo v. Kliger*, 801 P.2d 373, 385 (Cal. 1990). When required, "[e]xhaustion of administrative remedies is a jurisdictional prerequisite to resort to the courts." *Campbell*, 106 P.3d at 982 (quoting *Johnson v. City of Loma Linda*, 5 P.3d 874, 879 (Cal. 2000) (internal quotations omitted)).

"Administrative exhaustion can be either statutorily required or judicially imposed as a matter of prudence." *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007). "Where there is no explicit statutory requirement of exhaustion of administrative remedies, the application of exhaustion rules is a matter committed to the discretion of the district court."

*Morrison-Knudsen Co., Inc. v. CHG Int'l, Inc.*, 811 F.2d 1209, 1223 (9th Cir. 1987) (citation omitted). "Courts may require prudential exhaustion if (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate by pass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review." *Puga*, 488 F.3d at 815 (quotation omitted).

In this case, the Complaint alleges, "In order to discharge stormwater into the Bay, Plaintiff is required to receive a Municipal Regional Stormwater Permit from the Regional Water Board, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act." (ECF No. 1 ¶ 118). The San Diego Regional Quality Control Board issued Plaintiff, among other permittees, NPDES permits in 2007, 2013, and 2015. (ECF Nos. 5-4, 5-5, 5-6). Plaintiff and other permittees have filed test claims in administrative proceedings before the Commission, challenging certain provisions of the permits and contending that those provisions constituted unfunded mandates for which the permittees are entitled to State reimbursement. (ECF Nos. 5-7, 5-9). In 2010, the Commission determined that certain provisions of the 2007 permit were unfunded state mandates subject to reimbursement. (ECF No. 5-8). The California Court of Appeal upheld the Commission's decision and the California Supreme Court denied review. *See Dep't of Fin.*, 226 Cal. Rptr. 3d 846. Test claims challenging certain provisions of the 2013 and 2015 permits are currently pending before the Commission. (ECF Nos. 5-9, 5-10).

The administrative mandate procedure before the Commission "is the exclusive way for a local agency to claim reimbursement for state mandated costs." *Lake Madrone Water Dist. v. State Water Res. Control Bd.*, 256 Cal. Rptr. 894, 902 (Ct. App. 1989); *see also Tri-County Special Educ. Local Plan Area v. Cty. of Tuolomne*, 19 Cal. Rptr. 3d. 884, 889 (Ct. App. 2004) ("Without first exhausting the administrative remedies, the local agency

cannot claim a section 6 violation in defense of its failure to perform its duty . . . . After a determination by the Commission that reimbursement is due, but only then, may the local government bring a traditional mandamus action . . .). However, in this case, the City brings a cause of action in tort for public nuisance against a private entity pursuant to applicable sections of the California Civil Code and the California Code of Civil Procedure. California law does not establish an administrative procedure for a public nuisance claim. *See Abelleira*, 109 P.2d at 949 ("[W]here an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act."). While some of the damages Plaintiff seeks from Defendants in this public nuisance claim may overlap with the unfunded state mandate costs at issue in pending test claims before the Commission, the jurisdictional requirement of administrative exhaustion is limited to "where an administrative remedy is required by statute." *Id.* The Court concludes that Plaintiff is not precluded from bringing its public nuisance claim by any statutory administrative exhaustion requirement. The Court further concludes that prudential exhaustion is not warranted at this stage in proceedings. *See Morrison-Knudsen Co.*, 811 F.2d at 1223.

## VI. INTERLOCUTORY APPEAL

In the alternative, Defendants seek certification for interlocutory appeal. (ECF No. 5-1 at 25). Defendants contend that "whether a municipality must exhaust the Commission's administrative remedies for State-imposed permit compliance costs before litigating to seek recovery of the same costs in federal court" is a controlling question of law. Defendants contend that discretionary decisions of district courts, including discretionary decisions not to require prudential exhaustion, "routinely serve as proper bases for certification of an interlocutory appeal in the Ninth Circuit." *Id.* at 27. Defendants contend that certification is appropriate because there is a difference of opinion

12

among district courts on whether exhaustion is necessary on this issue. Defendants assert that interlocutory appeal will reduce the scope of and materially advance the litigation.

Plaintiff contends that interlocutory appeal is not warranted in this case on this issue. Plaintiff contends that Defendants' "question for appeal depends on a the factual issue of whether Plaintiffs' tort damages are the same as or overlap with costs subject to test claims before the Commission." (ECF No. 16 at 22).

A district court may certify an otherwise non-appealable order for appellate review when three conditions are met: (1) the order involves a "controlling question of law"; (2) there is "substantial ground for difference of opinion"; and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). All three criteria must be met in order for a district court to certify an issue for interlocutory appeal. *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010). "Section 1292(b) is a departure from the normal rule that only final judgments are appealable, and therefore must be construed narrowly." *James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1067 n.6 (9th Cir. 2002); *United States v. Woodbury*, 263 F.2d 784, 788 n.11 (9th Cir. 1959) ("[Section] 1292(b) is to be applied sparingly and only in exceptional cases").

A question is "controlling" for purposes of § 1292(b) if "resolution of the issue on appeal could materially affect the outcome of litigation in the district court." *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982). "To determine if a 'substantial ground for difference of opinion' exists under § 1292(b), courts must examine to what extent the controlling law is unclear." *Couch*, 611 F.3d at 633. "Courts traditionally will find that a substantial ground for difference of opinion exists where the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented." *Id.* (internal citations and quotation marks omitted). "That settled law might

be applied differently does not establish a substantial ground for difference of opinion." *Id*. at 633.

In this case, the Court finds that Defendants do not identify a controlling question of law. The question of "whether a municipality is required as a matter of prudence to exhaust administrative remedies with the Commission before initiating litigation over the exact same costs" is not a pure question of law in this case. The question presumes a factual determination that the same costs are at issue in the various proceedings. The question challenges the Court's application of existing law on administrative exhaustion and prudential exhaustion to the factual circumstances of this case. Courts in the Ninth Circuit have determined that mixed questions of fact and law are not appropriate for interlocutory appeal under § 1292(b). *See, e.g.*, *City of San Jose v. Monsanto Co.*, No. 5:15-CV-03178-EJD, 2017 WL 6039670, at *1 (N.D. Cal. Dec. 6, 2017); *Halloum v. McCormick Barstow LLP*, No. C-15-2181 EMC, 2015 WL 4512599, at *2 (N.D. Cal. July 24, 2015); *Karoun Dairies, Inc. v. Karlacti, Inc.*, No. 08CV1521 AJB (WVG), 2014 WL 11906588, at *4 (S.D. Cal. Sept. 3, 2014). Absent a controlling question of law warranting certification for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), the motion for certification for interlocutory appeal is denied. *See In re Cement*, 673 F.2d at 1026 (holding that interlocutory appeal is only justified under "exceptional circumstances.").

## VII. CONCLUSION

IT IS HEREBY ORDERED that the Motion to Dismiss or Stay filed by Defendants is DENIED. (ECF No. 5). The alternative request for certification for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) is DENIED.

Dated: March 21, 2019

Hon. William Q. Hayes
United States District Court